# United States District Court
# Southern District of Texas

### Case Number: _H-06-1394_

## ATTACHMENT

**Description:** _Notice of Removal_

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _____ of _____

☑ Exhibit to: _Nta of Removal_
number(s) / letter(s) ___A & B_____

**Other:** _____

_____

_____

A



2006-22614

CAUSE No. _____

FILED
CHARLES BACARISSE
DISTRICT CLERK
HARRIS COUNTY. TEXAS
2006 APR 11 PM 1:31
BY _____

| | |
|---|---|
| JAMES MARRON, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>STEWART & STEVENSON SERVICES, INC., MAX LUKENS, MONROE M. LUTHER, CHARLES R. OFNER, CHARLES S. REAM, ROBERT S. SULLIVAN, and JAMES M. TIDWELL,<br><br>    Defendants. | IN THE DISTRICT COURT<br><br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br>127   JUDICIAL DISTRICT |

## CLASS ACTION PETITION

  Plaintiff James Marron, by his attorneys, alleges upon information and belief, except as to paragraph 2 which is alleged upon personal knowledge, as follows:

  1.  This is a shareholder class action, which seeks injunctive relief with regard to a proposed acquisition of Stewart & Stevenson Services, Inc. ("S&S" or the "Company") by Armor Holdings, Inc. and its wholly-owned subsidiary, Santana Acquisition Corp. ("Santana," and together with Armor Holdings, Inc., "Armor"), announced on February 27, 2006 (the "Acquisition"). Plaintiff alleges that the Defendants failed to maximize shareholder value by entering into the Acquisition despite the known existence of a financially superior offer to acquire the Company, that the Acquisition is subject to an unreasonable termination fee and other measures that are designed to preclude alternative superior proposals, that the Defendants unfairly favored Armor and the Acquisition over alternative bidders and proposals, and that the proxy materials released in connection with the Acquisition either omit material information or are materially false and misleading.

676389.1/009557

## THE PARTIES

2.      Plaintiff James Marron ("Plaintiff") owns 100 shares of S&S common stock and has owned such shares continuously since prior to the wrongs complained of herein.

3.      Defendant S&S, founded in 1902, is primarily engaged in the design, manufacture, and service of medium and light tactical vehicles for the U.S. Army and others worldwide. S&S is incorporated in the State of Texas and maintains corporate headquarters at 2707 North Loop West, Houston, Texas 77008.   S&S's stock is traded on the New York Stock Exchange under the symbol "SVC."

4.      Defendant Max Lukens ("Lukens") is and at all relevant times has been a member of the board of directors of S&S (the "Board"). Lukens has been the Company's President and Chief Executive Officer ("CEO") since 2004.   Lukens previously served as Chairman of the Board of the Company from December 2002 to March 2004.   Lukens currently owns approximately 581,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Lukens will receive payment of approximately $15 million in exchange for his options.

5.      Defendant Monroe M. Luther ("Luther") is and at all relevant times has been a director of the Company.   Luther currently owns approximately 26,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Luther will receive payment of approximately $411,963 for his options.

6.      Defendant Charles R. Ofner ("Ofner") is and at all relevant times has been a director of the Company.   Ofner currently owns approximately 26,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Ofner will receive payment of approximately $411,963 for his options.

7.    Defendant Charles S. Ream ("Ream") is and at all relevant times has been a director of the Company. Ream currently owns approximately 10,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Ream will receive payment of approximately $158,650 for his options.

8.    Defendant Robert S. Sullivan ("Sullivan") is and at all relevant times has been a director of the Company. Sullivan currently owns approximately 29,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Sullivan will receive payment of approximately $443,150 for his options.

9.    Defendant James M. Tidwell ("Tidwell") is and at all relevant times has been a director of the Company. Tidwell currently owns approximately 10,000 shares of Company common stock subject to options that will immediately vest upon completion of the Acquisition, at which point Tidwell will receive payment of approximately $158,160 for his options.

10.    The Defendants referred to in paragraphs 4 through 9 are collectively referred to herein as the "Individual Defendants," and together with S&S, the "Defendants."

11.    By reason of the above Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public stockholders of S&S, and owe Plaintiff and the other members of the class the highest obligations of good faith, fair dealing, due care, loyalty, and full and candid disclosure.

<u>CLASS ACTION ALLEGATIONS</u>

12.    Plaintiff brings this action individually and as a class action pursuant to Tex R. Civ. P. 42 on behalf of all common stockholders of the Company (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants.

13.    This action is properly maintainable as a class action.

14.     The Class is so numerous that joinder of all members is impracticable.  As of February 24, 2006, there were approximately 29.4 million shares of S&S common stock issued and outstanding.

15.     There are questions of law and fact which are common to the Class including, *inter alia*, the following:

      a.     whether the Acquisition is unfair to the Class;

      b.     whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

      c.     whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class; and

      d.     whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by Defendants.

16.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

17.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

18.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

676389.1/009557                              - 4 -

## SUBSTANTIVE ALLEGATIONS

**A.    S&S's Business and Relationships With Armor**

19.    In the Company's fiscal year 2004 Annual Report on Form 10-K (the "10-K"), S&S noted three primary business segments: the Tactical Vehicle Systems segment (which assembles the Family of Medium Tactical Vehicles ("FMTV") under contracts with the U.S. Army, and provides sustaining design engineering, service and support); the Power Products segment (which sells and rents various industrial equipment; sells components, replacement parts, accessories and other materials supplied by independent manufacturers; and provides in-shop and on-site repair services for industrial, transportation, marine, construction, power generation and material handling equipment); and the Engineered Products segment (which manufactures coil tubing, acidizing, fracturing and seismic equipment systems for the oil service industry as well as railcar mover and snow removal equipment for their respective markets).

20.    According to the Company, S&S is primarily engaged in the design, manufacture, and service of medium and light tactical vehicles for the U.S. Army and others worldwide.  For the fiscal year ended January 21, 2005, S&S realized more than $1.15 billion in revenue, nearly $550 million (48%) of which was derived from the Tactical Vehicle Systems segment. Furthermore, of the $62.7 million in earnings from continuing operations that the Company realized in FY04, $64 million (102%) came from the Company's Tactical Vehicle Systems segment as a result of losses in other segments. S&S's Tactical Vehicle Systems segment is, indeed, the Company's most profitable segment.

21.    During Fiscal 2004 and early Fiscal 2005, the Company received multiple contract awards, supplementing the tactical vehicle production under the Company's U.S. Army contracts. These awards included contracts for the production of 1,743 Low Signature Armored Cabs ("LSAC") for use on the FMTV, which had a total contract value of approximately

$153 million. Additionally, the Company received contract awards from the U.S. Army and Lear Siegler, Inc. to "reset" vehicles that have sustained damage in support of Operation Iraqi Freedom and Operation Enduring Freedom. Under these contracts, the Company reset approximately 1,650 FMTV's which have been placed in service since 1992, along with 400 of the U.S. Army's Heavy Expanded Mobility Tactical Trucks ("HEMTT") to their full operational standards. The total estimated contract value under the reset contracts is approximately $30.3 million.

22.     On April 7, 2006, the Company filed with the Securities and Exchange Commission ("SEC") and disseminated to its shareholders a Form DEFM14A (the "Proxy Statement") in which it provided to Company shareholders certain information regarding the Acquisition.  In the Proxy Statement, the Company disclosed the following contracts that it has with the U.S. Army, and the material relationships that it maintains with Armor:

> In April 2003, the Company received a third multi-year contract from the U.S. Army that provided for continued production of the FMTV through September 2008. Base production under the third contract will include 7,063 trucks and 3,826 trailers at an initial contract value of approximately $1.2 billion. The U.S. Army also has the option to order up to an additional 7,675 trucks and 4,268 trailers over the term of the contract, which could extend production beyond September 2008 depending on options exercised. Base production under this contract has been funded by the U.S. government through September 2006, and as of March 1, 2005, the U.S. Army has exercised options for 647 trucks and 940 trailers under this contract.

> One of our subsidiaries and a subsidiary of Armor Holdings are parties to teaming agreements relating to the joint development of the armored cab for the U.S. Army's Family of Medium Tactical Vehicles, which includes the High Mobility Artillery Rocket System, and purchase orders for the supply by a subsidiary of Armor Holdings to one of our subsidiaries of armoring materials for incorporation into our Low Signature Armored Cabs.

23.     The value of these relationships between S&S and Armor cannot be denied.  As reported by The Cincinnati Enquirer on February 1, 2005:

> Armor Holdings Inc.'s Fairfield plant will supply armor truck cap components under a new $32.4 million contract with Stewart & Stevenson Inc. for its family

of medium tactical vehicles for the Army. Jacksonville, Fla.-based Armor said it will supply ballistics glass, armor panels and gun turret assemblies for Stewart & Stevenson's low-signature armored cabs. Stewart & Stevenson has Army orders valued at $155 million for the low-signature armored cabs.

24.     As to the importance of the contracts with the U.S. Army, and therefore the business relationship with Armor, the Company stated in its 10-K:

> The U.S. Government is the primary customer of the Tactical Vehicle Systems segment, accounting for nearly all of the current sales of this segment. The FMTV contracts are subject to termination at the election of the customer and provide for termination charges that would reimburse the Company for allowable costs, but not necessarily all costs incurred. The loss of this customer would have a material adverse effect on the Company's future financial condition and results of operations.

25.     S&S acknowledged in the 10-K that its primary competitor in this segment for domestic truck sales is Oshkosh Trucking, Inc. ("Oshkosh").

**B.    The Acquisition**

26.     On March 3, 2006, in a Form 8-K filed with the SEC, the Company formally announced to the public that it had entered into an agreement and plan of merger (the "Merger Agreement") with Armor on February 27, 2006.

27.     Pursuant to the Merger Agreement, S&S will merge with and into Santana, with S&S remaining as the surviving entity, and the shareholders of S&S will receive $35.00 per share of common stock.

28.     On March 30, 2006, the Company announced that it had scheduled a special meeting of shareholders for Tuesday, May 9, 2006, at 10:00 a.m., Houston time, to consider and vote upon the Acquisition.

C.   **The Defendants Have Breached Their Fiduciary Duty by Failing to Maximize Shareholder Value When Selling the Company**

29.   In the Proxy Statement, the Company published certain information regarding the background of the Acquisition, including information concerning other proposals to acquire the Company that S&S was considering while negotiating the Acquisition with Armor.

30.   In early 2005, a company referred to in the Proxy Statement as "Company A" requested a meeting to discuss a possible strategic combination of S&S and Company A.  As a result of this inquiry, the Company entered into a confidentiality agreement with Company A, despite Company A's assertion that it was primarily interested in acquiring the Company's Tactical Vehicle Systems Division, and not the Company's other assets.  On March 30, 2006, Oshkosh identified itself as the company referred to as "Company A" in the Proxy Statement.

31.   Throughout 2005, the Company facilitated the sale of both the Engineered Products Division and the Power Products Division, thus leaving the Company with the Tactical Vehicle Systems Division as its primary business operation.

32.   In November and December of 2005, the Company entered into confidentiality agreements with six separate potential bidders, including Armor, Oshkosh, and two additional companies referred to in the Proxy Statement as "Company B" and "Company C."

33.   On December 20 and 21, 2005, the Company received indications of interest from five of the six parties who signed confidentiality agreements, including Oshkosh, Company B, Company C, and Armor, which reflected possible offers for S&S ranging from a low of $23.70 per share to a possible high of $29.00.  After receiving these indications of interest, S&S invited each of the five parties to Houston to engage in due diligence of the Company.

34.   On February 23, 2006, S&S received final bids from three parties: Armor Holdings, which offered to acquire the Company for $34.00 per share; Oshkosh, which offered

to acquire the Company at $28.50 per share; and Company C, which offered to acquire the Company at $31.00 per share.

36.     On February 25, 2006, Oshkosh increased its offer price per share to $32.00, and, on the same day, Company C also increased its offer price per share to $32.00 per share.  On February 26, 2006, Armor offered to increase its offer price to $34.75 per share

36.     On February 26, 2006, shortly after Armor increased its offer to $34.75 per share, Oshkosh again increased its offer price per share to $35.50, $0.75 per share higher than the highest existing offer from Armor.  With 29.4 million shares of S&S common stock outstanding, the $35.50 offer by Oshkosh would have represented an additional $22.05 million in consideration to the Company common shareholders above the $34.75 offer by Armor.

37.     Later in the day on February 26, 2006, Armor indicated that it would be willing to increase its offer for S&S from $34.75 per share to $35.00 per share.  However, Armor's offer was contingent upon the Company not communicating with other parties while continuing to work to finalize and execute the Merger Agreement before the markets opened on February 27, 2006.  Throughout the remainder of the evening of February 26, 2006, and into the morning of February 27, 2006, S&S continued the negotiations of, and entered into, the Merger Agreement with Armor.

38.     On February 27, 2006, less than 24 hours after Oshkosh offered to pay $35.50 per share in order to acquire S&S, the Defendants agreed to the Acquisition and entered into the Merger Agreement with Armor, thus accepting only $35.00 per share for the Company, an offer that was still $0.50 less than the offer by Oshkosh.

**D.     The Defendants Have Breached Their Fiduciary Duties by Favoring Armor in the Acquisition and Precluding Superior Offers for the Company**

39.     As indicated herein, S&S derives a substantial portion of its revenue and net income from its contracts with the U.S. Army.  In connection with these contracts, S&S main-

tains a business relationship with Armor, primarily because Armor is a direct supplier of essential materials needed for S&S to fulfill its obligations under its contracts with the U.S. Army. As S&S alluded to in the Proxy Statement, the contracts with the U.S. Army are cancellable at any time at the election of the U.S. Army, and, if cancelled, would result in a material impairment in S&S's financial results. The dependence of S&S on its business relationship with Armor to fulfill the Company's obligations to the U.S. Army has incentivized the Defendants to favor Armor in the bidding process for the Company.

### 1. The Board Favored Armor by Entering Into a Standstill Agreement in Connection with the Acquisition

40.     In the Proxy Statement, the Company stated that Armor would be willing to raise its offer from $34.75 to $35.00 per share, conditioned upon the Company not communicating with other parties while continuing to work to finalize and execute the Merger Agreement before the markets opened on February 27, 2006.

41.     This agreement with Armor to maintain secrecy with respect to the progression of the negotiations between S&S and Armor is effectively a "standstill agreement" between the parties, which is designed to favor Armor while deterring other potential acquirors from bidding for the Company.

42.     On March 28, 2006, Stephen E. Levenson ("Levenson"), an analyst at Ryan Beck & Co., discussed the preclusive nature of certain standstill agreements in connection with the Acquisition:

> There is an allusion to standstill terms as part of the confidentiality statement potential bidders were required to execute before commencing the due diligence process .... Such an agreement would give the selected bidder a finite time period to complete the transaction during which others subject to the standstill would be precluded from bidding. We think this is the reason for an absence of further bids.

43.     Accordingly, the standstill terms insisted upon by Armor on February 26, 2006, served to unfairly favor Armor over other potential bidders for the Company, and to restrict the opportunity of other bidders to effectively modify their existing bids for the Company. In light of the fact that the Defendants knew that there was at least one financially superior bid for the Company available at the time it signed the Merger Agreement, the moratorium on communication provided by the standstill agreements was grossly irresponsible and is a blatant breach of the Individual Defendants' fiduciary duties to S&S's shareholders.

      **2.**      **The Defendants Have Precluded the Oshkosh Offer and Other Superior Offers to Acquire the Company by Entering into a Merger Agreement That Includes an Unlawful Termination Fee**

44.     The Merger Agreement provides that S&S will be obligated to pay to Armor a termination fee of $37.34 million (the "Termination Fee") if the Company terminates the Merger Agreement to accept a superior proposal for the Company. This Termination Fee is onerous and unlawful, representing 4.82% of the enterprise value of the Acquisition, especially when viewed in light of the premature conclusion of the auction process.

45.     The Termination Fee has a chilling effect on other potential bids for the Company. In order to make a superior offer, a third-party bidder now has to bid $1.25 more pre share than the consideration offered in the Acquisition.

46.     On March 21, 2006, Michael E. Hoffman ("Hoffman"), an analyst with Friedman, Billings, Ramsey & Co., Inc. highlighted the restrictive nature of the Termination Fee. Hoffman stated that "A breakup fee of $37.34 million suggests that a competing bid would have to be at last $36.25 to be of equivalent value to SVC."

47.     Absent the Termination Fee, the offer by Oshkosh to acquire S&S is $0.50 per share more than the consideration offered in the Acquisition. However, the effect of the Termination Fee is to immediately transform the financially superior bid by Oshkosh into an offer that

is *inferior* to the Acquisition by $0.75 per share, or a total of $22.05 million.  Furthermore, if a third-bidder other than Oshkosh desires to acquire the Company, they will be forced to effectively pay $36.25 per share, or $36.75 million more than the consideration offered by Armor in the Acquisition.

48.     Accordingly, the S&S shareholders have been further harmed in this Acquisition by the Termination Fee, which deters other potential suitors from bidding on S&S and providing the shareholders with a higher price for their shares.

**E.     The Defendants Have Breached Their Fiduciary Duties by Failing to Disclose Material Information to the Company Shareholders in the Proxy Statement**

49.     In providing proxy and other materials to company shareholders in the context of a corporate acquisition, the board of a company has a fiduciary duty to disclose all material information to the shareholders so that the shareholders are able to make a fully informed and reasonable decision regarding their equity interest in the company.  This duty obligates the company to provide to its shareholders information that is not false or materially misleading. Here, before S&S shareholders are asked to part with their interest in this profitable company, they must be given all material information sufficient to allow them to decide whether to vote for or against the Acquisition.

50.     In the Proxy Statement, the Company has failed to disclose the nature of the potential regulatory issues that exist with respect to a possible combination with Company A. The Company's statements in the Proxy Statement merely indicate that such regulatory issues exist, in part because Oshkosh is a competitor of S&S, and rely on this cursory explanation as a reason to rebuff the offer by Oshkosh to acquire the Company.  However, on March 20, 2006, in the same press release in which Oshkosh identified itself as Company A, Oshkosh's CEO, Robert Bohn ("Bohn") stated:

> While we are aware that Stewart & Stevenson indicated that they believed there were potential antitrust risks in connection with a combination with our company, we never believed that any such risks would preclude or significantly delay such a transaction .... We are also not aware of any other significant regulatory issues affecting our company.

51.     The statements made by Bohn directly contradict the statements made by the Company in the Proxy Statement and, if true, render the statements made by the Company in the Proxy Statement materially false and misleading.

52.     In addition, the Company stated in the Proxy Statement that: "It is currently expected that none of our directors or executive officers will become a director or officer of Armor Holdings or Acquisition Corp. Armor Holdings and Acquisition Corp. currently have no arrangements or agreements with any of our officers following completion of the merger." However, on February 28, 2006, Purva Patel ("Patel") published in article in The Houston Chronicle in which Robert Schiller ("Schiller"), Armor's President, is credited with stating that, while it was unclear how the Acquisition would affect employees, the Company's current management team plans to stay on.

53.     The comments by Schiller indicate that the Company's statement regarding arrangements or agreements between Armor and employees of the Company may not be entirely forthcoming and, if true, render the statements made by the Company in the Proxy Statement materially false and misleading.

54.     Furthermore, in the "Background of the Merger" and "Opinion of our Board's Financial Advisor" sections of the Proxy Statement, Defendants fail to disclose material details with respect to the Acquisition that are vital to a reasonable shareholder's ability to decide whether to vote for or against the Acquisition.

55.     With respect to the "Background of the Merger" section of the Proxy Statement, the following examples of material omissions render the Proxy Statement materially misleading

and preclude shareholders from being able to make a fully-informed decision whether to vote for

or against the Acquisition:

    a.    The identity of the Company representatives that negotiated the Merger Agreement with Armor, and whether a special committee of independent directors was formed in connection with the negotiation of the Merger Agreement;

    b.    Whether any director or executive of the Company will be employed by Armor or any of its affiliates after the Acquisition is consummated and, if so, the terms under which each director or executive will be employed and the compensation that each director or executive will receive for such employment;

    c.    Whether any director or executive of the Company was to be employed by Oshkosh, any other potential bidder, or any of their respective affiliates if an acquisition of the Company by Oshkosh or any other potential bidder is consummated;

    d.    Whether any director or executive of the Company will receive additional consideration from Armor or any of its affiliates upon the consummation of the Acquisition that will not be paid to S&S shareholders, and, if so, the amount and form of such consideration, and conditions under which such consideration will be received;

    e.    Whether any director or executive of the Company was to receive additional consideration from Oshkosh, any other potential bidder, or any of their respective affiliates if an acquisition of the Company by Oshkosh or any other potential bidder is consummated, and, if so, the amount and form of such consideration, and the conditions under which such consideration would be received;

    f.    The identity of the outside consultant that worked with Defendant Lukens in the first nine months of 2003 to analyze the Company's overall business strategy, to assess the value of each of the Company's businesses on a stand-alone basis, and to evaluate the Company's personnel and assist with strategic and operational planning;

    g.    Whether this outside consultant received any fees for these services, and, if so, in what amount;

    h.    The strategic alternatives that Lukens, the outside consultant, and Merrill Lynch & Co. ("Merrill Lynch") discussed during the first nine months of 2003;

    i.    The identity of the financial advisor that the Company engaged to assist with the sale of the Company's Engineered Products Division, and the

identity of the purchaser of the Company's Power Produces Division and Engineered Products Division;

j.   The strategic alternatives that the Board discussed with Merrill Lynch in August and September of 2004;

k.   The terms under which Merrill Lynch was engaged to act as the Company's financial advisor in connection with strategic advisory and investment banking services in February 2005, and the fees that were paid to, and the services that were provided by, Merrill Lynch in connection therewith;

l.   The terms of the confidentiality agreement that the Company entered into with Company A in early 2005;

m.   The identity of Company B and Company C;

n.   The reasons why the Company concluded that pursuing a strategic transaction in October 2005 would not be likely to result in maximizing value to the Company's shareholders;

o.   The 13 potential strategic and financial buyers that the Company believed might be interested in pursuing an acquisition of the Company, and the basis upon which these 13 potential buyers were chosen;

p.   The terms of the confidentiality agreements that were entered into with Company A, Company B, Company C, and Armor Holdings in November 2005;

q.   The identity of the six parties that signed confidentiality agreements with the Company;

r.   The reason(s) why the Company agreed to not communicate with other parties while continuing to work to finalize and execute the Merger Agreement with Armor before the markets opened on February 27, 2006;

s.   The projected stand-alone prospects, projected financial performance, and possible alternatives to the merger that the Board considered and discussed with Merrill Lynch; and

t.   The Company's fiscal year 2005 financial results.

56.   With respect to the "Opinion of our Board's Financial Advisor" section of the Proxy Statement, the following examples of material omissions render the Proxy Statement materially misleading and preclude shareholders from being able to make a fully-informed decision whether to vote for or against the Acquisition:

a.    What fee Merrill Lynch was paid in connection with the services provided during the course of the negotiations and for the delivery of the fairness opinion;

b.    With respect to the "Historical Trading Performance" section, the basis upon which the "Defense Equipment Companies" were chosen;

c.    With respect to the "Comparable Acquisition Analysis," the basis upon which Merrill Lynch selected the "Comparable Acquisitions," the basis upon which Merrill Lynch chose reference ranges of 9.5x to 12.5x for S&S's latest-twelve-month EBITDA and 8.5x to 10.5x for S&S's 2006 estimated EBITDA, and what calculations were performed to derive a range of implied values per share of S&S common stock of approximately $24.50 to $27.75;

d.    With respect to the "Comparable Trading Analysis," the basis upon which Merrill Lynch selected the "Comparable" Defense Equipment Companies, the basis upon which Merrill Lynch chose reference ranges of 9.5x to 11.5x for S&S's latest-twelve-months EBITDA and 8.0x to 10.0x for S&S's 2006 estimated EBITDA, and what calculations were performed to derive a range of implied values per share of S&S common stock of approximately $23.50 to $27.00; and

e.    With respect to the "Discounted Cash Flow Analysis," upon what basis Merrill Lynch determined a range of fiscal years 2006 through 2010 to evaluate the Company's financial performance, the basis upon which Merrill Lynch chose discount rates ranging from 10.0% to 12.0% and perpetual growth rates of free cash flow after fiscal year 2010 ranging from 0.5% to 2.0%, what calculations were performed to derive a range of implied values per share of S&S common stock of approximately $27.50 to $34.25.

57.    Because the Company has made material omissions from, and has otherwise failed to make material disclosures in, the Proxy Statement so as to provide the shareholders of the Company with the ability to make a knowledgeable and informed decision whether to vote for or against the Acquisition, the Board has breached its fiduciary duty to the S&S shareholders.

58.    The Individual Defendants were and are under a duty:

a.    to fully inform themselves of S&S's market value before taking, or agreeing to refrain from taking, action;

b.    to act in the interests of the equity owners;

c.    to maximize shareholder value;

    d.      to obtain the best financial and other terms when the Company's independent existence will be materially altered by a transaction; and

    e.      to act in accordance with their fundamental duties of due care and loyalty.

59.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and as part of a common plan and scheme, and in breach of their fiduciary duties to Plaintiff and the other members of the Class, are attempting unfairly to deprive Plaintiff and other members of the Class of the true value of their investment in S&S.

60.    S&S shareholders will, if the transaction is consummated, be deprived of the opportunity for substantial gains.

61.    By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other S&S public stockholders.

62.    As a result of the actions of Defendants, Plaintiff and the other members of the Class have been and will be damaged in that they have not and will not receive their fair proportion of the value of S&S's assets and businesses and will be prevented from obtaining appropriate consideration for their shares of S&S common stock.

63.    Unless enjoined by this Court, Defendants will continue to breach their fiduciary duties owed to Plaintiff and the other members of the Class, and may consummate the Acquisition which will exclude the Class from its fair proportionate share of S&S's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

64.    Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class and against Defendants as follows:

1) Declaring that this action is properly maintainable as a class action;

2) Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

3) Enjoining Defendants from proceeding with the Acquisition;

4) Enjoining Defendants from consummating the Acquisition, or a business combination with a third party, unless and until the Company adopts and implements a procedure or process, such as an auction, to obtain the highest possible price for the Company;

5) Enjoining the Termination Fee contained within the Merger Agreement;

6) Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of shareholders until the process for the sale or auction of the Company is completed and the highest possible price is obtained;

7) Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

8) Awarding Plaintiff and the Class appropriate damages;

9) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

10) Granting such other and further relief as this Court may deem just and proper.

676389.1/009557

- 18 -

**JURY DEMAND**

      Plaintiff demands a jury trial.

DATED:      April 10, 2006

                              Respectfully submitted,

                              SUSMAN GODFREY, L.L.P.

                              By: _Stephen D. Susman (by permission T. Oxford)_
                              Stephen D. Susman
                              State Bar No. 19521000
                              1000 Louisiana, Suite 5100
                              Houston, TX 77002
                              (713) 651-9366

                              -and-

                              Terrell W. Oxford
                              State Bar No. 15390500
                              901 Main Street, Suite 5100
                              Dallas, TX 75202
                              (214) 754-1900

Of Counsel:

SCHIFFRIN & BARROWAY, LLP
Marc A. Topaz
Lee D. Rudy
Sandra G. Smith
James H. Miller
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

THE WEISER LAW FIRM, P.C.
Patricia Weiser
Robert B. Weiser
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
(610) 225-2677

## DECLARATION OF RITA SCHAULAT

STATE OF TEXAS     §
                     §
COUNTY OF HARRIS    §

     I, Rita Schaulat, hereby declare and state:

     1.     I am the duly appointed Assistant Corporate Secretary of Stewart & Stevenson Services, Inc. ("Stewart & Stevenson"). I have personal knowledge of the matters set forth in this declaration which are true and correct and, if called as a witness, I would testify competently thereto.

     2.     I have been employed by Stewart & Stevenson as Assistant Corporate Secretary for more than five years and am generally familiar with the corporate books and records of the Stewart & Stevenson including its common stock ownership records.

     3.     Stewart & Stevenson is a publicly traded company that is owned by its shareholders. As of the record date of April 5, 2006, Stewart & Stevenson had more than 29 million shares of common stock outstanding and had more than 400 shareholders of record. These numbers have not materially changed since then and there currently are more than 400 shareholders of Stewart & Stevenson common stock

     4.     I have conducted or caused to be conducted under my supervision a diligent and thorough search of Stewart & Stevenson share ownership records and can find no record of ownership of Stewart & Stevenson common stock by James Marron.

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

April 2/ , 2006                     *Rita Schaulat*
                                   Rita Schaulat